PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

v.

EUGENE AUBREY SIMS,
　　　　　*Defendant-Appellant.*

No. 01-4809

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
David A. Faber, District Judge.
(CR-00-139)

Argued: June 6, 2002

Decided: July 12, 2002

Before MOTZ and TRAXLER, Circuit Judges, and
Claude M. HILTON, Chief United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Traxler and Chief Judge Hilton joined.

## COUNSEL

**ARGUED:** Brian Joseph Kornbrath, Assistant Federal Public
Defender, Charleston, West Virginia, for Appellant. John Lanier File,
Assistant United States Attorney, Charleston, West Virginia, for
Appellee. **ON BRIEF:** Mary Lou Newberger, Federal Public
Defender, Charleston, West Virginia, for Appellant. Kasey Warner,
United States Attorney, Charleston, West Virginia, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A grand jury charged Eugene Aubrey Sims with being a felon in possession of a handgun, in violation of 18 U.S.C.A. §§ 922(g)(1) and 924(a)(2) (West 2000). After the district court denied Sims's motion to suppress evidence obtained in a police search, Sims entered a conditional plea of guilty. Sims now appeals the district court's suppression ruling, and we affirm.

The material facts in this case are uncontested; the parties dispute only their legal significance. On the evening of July 8, 1999, officer Matthew England of the Beckley, West Virginia Police Department was on cruiser patrol. At 8:52 p.m., England received a call from the Emergency Operations Center, informing him of an anonymous report that a black male wearing a T-shirt and blue jeans had just fired a pistol in the area of 809 1/2 South Oakwood Avenue. England had responded to calls in that area "many times" before, although the earlier calls "related to vagrancy" and "loitering."

England reached the address at about 8:54 p.m., got out of his cruiser, and searched an alley that ran between the buildings at 809 and 809 1/2 Oakwood Avenue. Finding no one there, he retraced his steps and then went into a vacant lot on the other side of the building, between the buildings at 809 and 813. As England looked across the lot, he saw a black male behind 813 "in a crouched position," "peeking around the corner . . . looking towards [him]." As soon as England made eye contact, the man "jerk[ed] right back" behind the house, out of England's view. England drew his weapon, pointed it toward the ground, and moved forward to investigate.

When England turned the corner of the house, he saw the man (later identified as Sims) standing alongside the house about ten yards away. Sims was wearing a white T-shirt and jeans. England pointed his weapon at Sims, and told Sims to place his hands on the side of the house. At about that time, two other officers arrived to provide backup. England holstered his weapon and conducted a pat-down search, during which he felt a "hard, metal object" that was obviously a firearm in Sims's right front pants pocket. As England reached into

Sims's pocket for the gun, Sims stated, without prompting, "I was just firing at the ground. I wanted to see if the thing would fire."

The officers handcuffed Sims and arrested him for carrying a concealed weapon and discharging a weapon within 500 feet of a dwelling. A criminal history check later revealed that Sims had been convicted for possession of cocaine in 1991; a federal grand jury then charged Sims with being a felon in possession of a handgun.

Sims moved to suppress the handgun and his statement to the police, asserting that Officer England lacked reasonable suspicion to stop and search him. The district court conducted an evidentiary hearing at which only Officer England testified. Finding England "to be a credible, believable witness," the court denied Sims's motion. Sims then entered a conditional plea of guilty, reserving his right to appeal the district court's suppression ruling. He exercises that right in this appeal.

This case thus presents a single issue: did Officer England have reasonable suspicion to stop and frisk Sims?

Sims asserts that *Florida v. J.L.*, 529 U.S. 266 (2000), controls. In *J.L.*, police received an anonymous tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. When police arrived at the bus stop a few minutes later, they found "three black males 'just hanging out,'" one of whom, J.L., was wearing a plaid shirt. *Id.* Although the officers "did not see a firearm, and J.L. made no threatening or otherwise unusual movements," the officers searched him. *Id.* at 268, 270. The Court suppressed the fruits of this search, explaining that the uncorroborated anonymous tip, by itself, did not create the reasonable suspicion of criminal activity necessary to support a search.* 529 U.S. at 270-72. *See also Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (requiring "reasonable, articulable suspicion that criminal activity is afoot" as a precondition to lawful stop and frisk) (citing *Terry v.*

---

*The *J.L.* Court noted the possibility that in some instances, "the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability," but found no such allegation in the case at hand. 529 U.S. at 273.

*Ohio*, 392 U.S. 1, 30 (1968)). Sims argues that the tip in his case was of the same nature as the tip in *J.L.*, because it was anonymous and provided information only about his race, gender, dress, and location.

We conclude, however, that Sims's furtive behavior distinguishes his case from *J.L.* The police officers in *J.L.* conducted a search "solely" on the basis of a tip, while their suspect was "just hanging out" in a public place, making "no . . . unusual movements." 529 U.S. at 268, 270 (internal quotation marks omitted). In contrast, when Officer England reached the vacant lot, he found Sims behind a house, "crouching" and "peeking around the corner" at him. As soon as England made eye contact, Sims "jerk[ed] right back" out of view.

An officer is entitled to consider the kind of "[e]vasive" behavior in which Sims engaged when "apprais[ing] . . . a streetcorner encounter." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (citing *United States v. Sharpe*, 470 U.S. 675, 683 n.3 (1985); *United States v. Espinosa*, 827 F.2d 604, 608 (9th Cir. 1987)). Sims was not merely "go[ing] about his business," and an officer could quite reasonably conclude that he was hiding. *See Wardlow*, 528 U.S. at 125. Moreover, Sims matched the tipster's description, was the only person about, and was a very short distance from the spot where a shot was reportedly fired just a few minutes before. Given these circumstances, we cannot say that it was unreasonable for an officer to suspect that Sims was the man of whom he had been warned.

We do not hold that the tip, by itself, or the conduct, by itself, would have justified a search. *See United States v. Arvizu*, 534 U.S. 266, ___, 122 S.Ct. 744, 750 (2002) (emphasizing that courts "must look at the 'totality of the circumstances' of each case" rather than considering each piece of evidence in isolation) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). In particular, Sims's behavior, while apparently evasive, was well short of "headlong flight" and might not have given rise to reasonable suspicion in a different context. *See Wardlow*, 528 U.S. at 124; *id.* 126-27 (Stevens, J. concurring in part). On the facts of this case, however, we conclude that England acted prudently "to protect himself and others from possible danger, and took limited steps to do so." *Terry*, 392 U.S. at 28.

Accordingly, the judgment of the district court is

*AFFIRMED.*