995 So.2d 285 (2008)
George BAPTISTE, Petitioner,
v.
STATE of Florida, Respondent.
No. SC07-1453.
Supreme Court of Florida.
September 18, 2008.
Rehearing Denied November 20, 2008.
*288 Bennett H. Brummer, Public Defender, and Colleen Brady Ward, Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, for Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Richard L. Polin, Chief Assistant Attorney General, and Timothy R.M. Thomas, Assistant Attorney General, Miami, FL, for Respondent.
LEWIS, J.
Petitioner George Baptiste seeks review of the decision of the Third District Court of Appeal in Baptiste v. State, 959 So.2d 815 (Fla. 3d DCA 2007), asserting that it expressly and directly conflicts with a decision of the Second District Court of Appeal, Rivera v. State, 771 So.2d 1246 (Fla. 2d DCA 2000), with regard to a question of law. We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.

FACTS AND PROCEDURAL HISTORY
On December 30, 2004, at approximately 5:45 a.m., Penny Ellison, an officer with the Miami-Dade Police Department, received a radio dispatch stating that an anonymous caller had reported that a black male wearing a white T-shirt and blue-jean shorts had waved a firearm in front of a grocery store located at 211th Street and Northwest 37th Avenue. The transcript of the suppression hearing reveals that when Officer Ellison arrived in this area, another female officer, Terrika Williams,[1] had already stopped a black male at gunpoint who was wearing a white T-shirt and blue-jean shorts. Officer Ellison immediately drew her weapon and the two officers ordered the individual, defendant George Baptiste, to lie on the ground. After the stop at gunpoint had been made and a second officer had arrived at the location, a citizen approached and advised Officer Ellison that he had been the anonymous caller and intended to remain anonymous, but the individual being held at gunpoint was the person he had identified in his anonymous call. That person then disappeared and has never been identified. Subsequently, and as Baptiste lay on the ground, the officers frisked him. At that point, Baptiste advised them that he was in possession of a firearm and Officer Ellison retrieved the firearm from Baptiste's front pocket. Other than gender, the record provides no additional information (such as name, age, address, or appearance) with regard to the anonymous caller.
Baptiste was arrested and charged with unlawful possession of a firearm by a convicted felon. See § 790.23(1)(a), Fla. Stat. (2004). During pretrial proceedings, Baptiste filed a motion to suppress, contending that the information provided in the anonymous tip was insufficient to establish the reasonable suspicion required to detain him. He asserted that the officers, upon their arrival at the scene, did not independently observe him engage in any illegal or suspicious conduct. Therefore, according to Baptiste, the anonymous tip was unreliable *289 and an insufficient basis to create the necessary reasonable suspicion and the gun must be suppressed under the requirements of the Fourth Amendment.
During the hearing on the motion to suppress, Officer Ellison testified that when she arrived at the scene, she did not observe Baptiste waving or carrying a firearm or engaging in any suspicious behavior. Officer Ellison further testified that Officer Williams, the first officer to arrive at the scene, did not indicate that Baptiste had engaged in any observed suspicious behavior. Officer Ellison acknowledged that other than the individual who approached her after Baptiste had been stopped at gunpoint and then disappeared, the only information she possessed that Baptiste had publicly waved a firearm was from the radio dispatch based on an anonymous caller.
According to Baptiste, he had been behind a grocery store when he saw a firearm and picked it up. Baptiste stated that as he walked around to the front of the store, he was holding the firearm in his hand down by the side of his leg. When he looked inside the store he did not see anyone, so he placed the gun in his pocket and walked across the street. When he was approximately four houses away from the store, an officer ordered him at gunpoint to lie on the ground and place his hands behind his back. The trial court denied the motion to suppress and a jury later convicted Baptiste of unlawful possession of a firearm by a convicted felon. The trial court sentenced Baptiste as a habitual felony offender to fifteen years' incarceration with a three-year mandatory minimum (due to the firearm).
Baptiste appealed his conviction and the Third District Court of Appeal affirmed. See Baptiste v. State, 959 So.2d 815, 817 (Fla. 3d DCA 2007). The district court attempted to distinguish Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), in which the United States Supreme Court held that an anonymous tip that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a concealed gun lacked sufficient indicia of reliability to provide the officers with reasonable suspicion to conduct a Terry[2] stop of a person at the bus stop who matched the identical description where the officers had no reason to suspect illegal conduct other than the anonymous tip. See Baptiste, 959 So.2d at 816; J.L., 529 U.S. at 268, 271. The Third District relied upon the following distinctions:
(1) The content of the original tip did not merely describe that the defendant was carrying a concealed firearm, as in J.L., but rather provided the obvious and extremely dangerous fact that a firearm was being openly displayed. In these circumstances, the "tip" itself rendered it reasonable for the officer to effect the stop necessary to inquire further.
(2) Unlike J.L., the "anonymous tipster" who made the 911 call was transmogrified into a constitutionally reliable citizen informant when the callerafter the stop at gunpoint, but before the pat-down search and seizure of the gun came to the scene and identified himself to the officers.
See 959 So.2d at 816-17.
On July 3, 2007, this Court accepted review of Baptiste based upon express and direct conflict with Rivera, in which the Second District held that an anonymous tip that a maroon Toyota, which bore a specific license plate number, and a white Mazda were exchanging gunfire did not *290 provide law enforcement with reasonable suspicion to stop the Toyota. Further, the decision of the Third District conflicts with our decision in J.L. v. State, 727 So.2d 204 (Fla.1998), which the United States Supreme Court subsequently affirmed in Florida v. J.L.

ANALYSIS
The Fourth Amendment to the United States Constitution and section 12 of Florida's Declaration of Rights guarantee citizens the right to be free from unreasonable searches and seizures. The Florida Constitution expressly provides that the right shall be construed in conformity with the Fourth Amendment to the United States Constitution, as interpreted by the United States Supreme Court. See art. I, § 12, Fla. Const. Thus, items obtained in violation of the Florida Constitution shall be excluded from evidence if the items would be excluded pursuant to the jurisprudence of the United States Supreme Court. See id.
In the landmark case Terry v. Ohio, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court concluded:
When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.
(Emphasis supplied.) The Supreme Court ultimately held that
where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.
Id. at 30, 88 S.Ct. 1868 (emphasis supplied). Since the High Court's decision, the limited stop-and-frisk of a suspect has been referred to as a Terry stop, and the key concern with regard to the legality of such an investigatory stop is the existence of a reasonable suspicion that is based upon specific and articulable facts, and the rational inferences that may be drawn from those facts. See id. at 21, 88 S.Ct. 1868; see also Ornelas v. United States, 517 U.S. 690, 693, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ("An investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion...."). In Terry, the stop was based upon observed suspicious conduct.[3]

*291 Reasonable Suspicion: Citizen Informants Versus Anonymous Tipsters

The United States Supreme Court has held that reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). According to the High Court:
Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.... [An] unverified tip from [a] known informant might not [be] reliable enough to establish probable cause, but nevertheless [is] sufficiently reliable to justify a Terry stop. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factorsquantity and qualityare considered in the "totality of the circumstancesthe whole picture," that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.
Alabama v. White 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (emphasis supplied) (citations omitted) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).
State and federal case law establishes that the reliability of a tip which alleges illegal activity varies based upon whether the tip is truly anonymous, such as an anonymous telephone call, or whether it is offered by a "citizen informant" who approaches the police in person to report criminal activity. A tip from a citizen informant falls at a higher end of the reliability scale. See State v. Maynard, 783 So.2d 226, 228 (Fla.2001). This hierarchy has been described as based on various factors. First, a citizen informant may be motivated not by pecuniary gain, but by the desire to further justice. See id. at 230. Second, unlike an anonymous tipster, a witness who directly approaches a police officer may be held accountable for false statements. See United States v. Christmas, 222 F.3d 141, 144 (4th Cir.2000) (citing Wardlow). Third, a face-to-face tip may be viewed as more reliable because the officers who receive the tip have the opportunity to observe the demeanor and evaluate the credibility of the person offering the information. See United States v. Heard, 367 F.3d 1275, 1279 (11th Cir. 2004). Fourth, a witness who approaches the police in person may subject himself or herself to potential reprisal from the defendant, thereby rendering the tip more reliable than an anonymous tip. See Christmas, 222 F.3d at 144. One treatise on the law of search and seizure explains:
[T]he courts have quite properly drawn a distinction between [a criminal informant] and the average citizen who by happenstance finds himself in the position of a victim of or a witness to criminal conduct and thereafter relates to the police what he knows as a matter of civic duty. One who qualifies as the latter type of individual, sometimes referred to *292 as a "citizen-informer," is more deserving of a presumption of reliability than the informant from the criminal milieu. As Justice Harlan pointed out in United States v. Harris,

the ordinary citizen who has never before reported a crime to the police may, in fact, be more reliable than one who supplies information on a regular basis. "The latter is likely to be someone who is himself involved in criminal activity or is, at least, someone who enjoys the confidence of criminals."
See 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 3.3, at 98 (4th ed.2004) (quoting United States v. Harris, 403 U.S. 573, 599, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (Harlan, J., dissenting)).
On the other hand, a truly anonymous tip has been consistently held to fall on the low end of the reliability scale, primarily because the veracity and reliability of the tipster is unknown. See J.L., 529 U.S. at 270, 120 S.Ct. 1375; Maynard, 783 So.2d at 229. Thus, the United States Supreme Court has held that for an anonymous tip to provide a reasonable basis for a Terry stop, the tip must contain specific details which are then corroborated by independent police investigation. See J.L., 529 U.S. at 270-71, 120 S.Ct. 1375; see also Maynard, 783 So.2d at 229. As noted in J.L., the United States Supreme Court has also concluded that the reliability of an anonymous tip that a suspect is engaged in illegal activity may be enhanced when an informant is able
to predict [a suspect's] future behavior, because it demonstrate[s] inside informationa special familiarity with [the suspect's] affairs.... Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.
Alabama v. White, 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Florida v. J.L.: The Validity of a Terry Stop Based on an Anonymous Tip.
The legality of a Terry stop when the sole basis for that stop was an anonymous tip was directly and precisely addressed by the Supreme Court in Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). In J.L., an anonymous caller informed the Miami-Dade Police that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Id. at 268, 120 S.Ct. 1375. When two officers arrived at the bus stop within six minutes, they observed an individual, J.L., who matched that precise description. See id. One of the officers ordered J.L. to place his hands on the bus stop sign, frisked him, and seized a firearm from his pocket. See id.; see also J.L., 727 So.2d at 205 ("One of the officers immediately accosted J.L., who was wearing a plaid shirt, and ordered him to place his hands above his head."). Unlike the detective in Terry, the officers in J.L. had not observed any illegal activity, unusual conduct, or suspicious behavior.
The High Court affirmed the decision of this Court that the Terry stop of J.L. violated the Fourth Amendment. See 529 U.S. at 269, 274, 120 S.Ct. 1375 (citing J.L. v. State, 727 So.2d 204 (Fla. 1998)). The Supreme Court explained that an anonymous tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." J.L., 529 U.S. at 272, 120 S.Ct. 1375 (emphasis supplied). The Supreme Court noted that even if the tip describes illegal behavior, a Terry stop is not justified unless the reliability of the tip has been established. See *293 id. at 273 n. *, 120 S.Ct. 1375. The Court also concluded that the fact that an anonymous tip ultimately proves to be accurate does not establish reasonable suspicion; rather, "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." Id. at 271, 120 S.Ct. 1375 (emphasis supplied). The Court noted that prior to the search, the officers' suspicion that J.L. was carrying a firearm was not generated by the observations of the officers themselves but, instead, solely by virtue of the anonymous phone call. See id. at 270, 120 S.Ct. 1375. The Court concluded that the tip lacked an indicia of reliability because "[t]he anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." Id. at 271, 120 S.Ct. 1375. Moreover, the tip did not provide the police with any predicted conduct to believe that the tipster possessed "inside" information about J.L. See id.
In concluding that the stop of J.L. violated the Fourth Amendment, the High Court rejected the State's contention that an exception should be created to justify a Terry stop when an anonymous tip contains allegations related to a firearm. See id. at 272, 120 S.Ct. 1375. The Court unanimously held that to do so would permit the Terry stop to be used as a tool of harassment:
Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. Several Courts of Appeals have held it per se foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. If police officers may properly conduct Terry frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics.
Id. at 272-73, 120 S.Ct. 1375 (citations omitted).

The Instant Case
The issue presented by the instant case is whether the anonymous 911 telephone call to policethat an individual waved a firearm in front of a supermarketprovided officers with reasonable suspicion to believe that Baptiste, who matched the description provided in the call, was armed and presently dangerous to the officer or to others, thereby permitting the officers under the Fourth Amendment to conduct a search of the clothing of Baptiste in an attempt to discover weapons which might be used to assault them. See Terry, 392 U.S. at 24, 30, 88 S.Ct. 1868. The Supreme Court has stated that "as a general matter determinations of reasonable suspicion ... should be reviewed de novo on appeal." Ornelas, 517 U.S. at 699, 116 S.Ct. 1657. A reviewing court must take care both to review findings of historical fact for clear error and to give due weight to inferences drawn from those facts by the finder of those facts. See id.
It is clear from the record of the suppression hearing that there was no evidence that the officers at the scene confirmed or observed any illegal activity, unusual conduct, or suspicious behavior to indicate that Baptiste was carrying a firearm before Officer Williams stopped Baptiste at gunpoint and these events transpired. During the suppression hearing, Officer Ellison clearly stated that an individual approached her anonymously and *294 then disappeared only after, and while, Baptiste was already held at gunpoint. The State has asserted both in its brief and during oral argument that we must look to the later trial transcript to establish that reasonable suspicion existed for Officer Williams, who was first on scene in response to the radio dispatch, to stop Baptiste at gunpoint. However, even if we were to ignore the suppression hearing and look to the trial transcript for evidence not presented at the suppression hearing, the assertion of the State is unavailing. During trial, Officer Williams only partially responded to a question with regard to what happened when she arrived at that location. Defense counsel objected to the question, and the trial court sustained the objection. Therefore, even if we could look to that objectionable question and partial answer, it is unknown and unascertainable from the record precisely what occurred when Officer Williams arrived.
Although the State contends that the actions of unknown witnesses unquestionably demonstrated that Baptiste had publicly waved a firearm, even if we could look to that later proceeding, we are unable to draw such a conclusion from an incomplete, truncated, partial answer given during trial when the liberty and constitutional rights of a criminal defendant are at stake. Indeed, even the decision of the Third District Court of Appeal does not acknowledge or rely upon the presence or the conduct of witnesses who were supposedly present when Officer Williams arrived at the location. Instead, the Third District directed its attention to the anonymous witness who allegedly came forward only after Baptiste was already stopped at gunpoint and allegedly identified himself as an anonymous callerbut who still remains anonymous due to the complete lack of any identifying information about this individual. Given both the lack of record evidence with regard to the information which was conveyed to Officer Williams, and the fact that there was no evidence or mention of these witnesses either during the suppression hearing or in the lower court's decision, we must work with the evidence from the suppression hearing that no one had informed the responding officers that Baptiste had waved a firearm before the stop at gunpoint.[4]

When the Seizure of Baptiste Occurred
The point at which the seizure of Baptiste occurred is important in determining whether the Terry stop in this case violated the Fourth Amendment because, as noted in J.L., the reasonableness of the officers' suspicion must be measured by the information that the officers knew before conducting the stop-and-frisk. See 529 U.S. at 271, 120 S.Ct. 1375; see also Hiibel v. Sixth Judicial District Court of Nevada, 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (noting that a Terry stop must be justified at its inception). In the absence of a formal arrest, whether a person has been seized will be adjudged in accordance with the reasonable person standard initially articulated by the United States Supreme Court in United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion). There, the Court stated:
We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained....

*295 We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.
Id. at 553-55, 100 S.Ct. 1870 (plurality opinion) (citations and footnote omitted) (emphasis supplied).
In the instant case, it is clear that Officer Williams drew her weapon and ordered Baptisteat gunpointto lie on the ground based only on her observation that Baptiste was a black male wearing a white T-shirt and blue-jean shorts. The State asserts that Baptiste was not seized at that time because he refused to fully comply with her orders. We reject this contention and conclude that, based on the totality of the circumstances, Baptiste was seized when Officer Williams stopped him at gunpoint. Cf. Terry, 392 U.S. at 16, 88 S.Ct. 1868 ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person."). It strains logic to assert that a reasonable person would feel free to leave when an officer arrives in a police vehicle, steps out of the vehicle, and points a weapon directly at that person while ordering that person to lie on the ground. Accordingly, the issue we must decide is whether reasonable suspicion existed to justify the seizure of Baptiste at the time that Officer Williams drew her weapon and ordered Baptiste to the ground.

Citizen-Informant Decisions Do Not Govern the Instant Case.
The conclusion of the Third District that the seizure of Baptiste was constitutional because the anonymous tipster was "transmogrified" into a citizen informant when he came forward only after Baptiste was stopped at gunpointand then disappeared and remains anonymousis contrary to existing law, and the Third District's reliance on citizen-informant cases is misplaced. Our United States Supreme Court has made clear that officers must possess reasonable suspicion at the time of the seizure, and events that transpire after the seizure may not be utilized in determining reasonable suspicion. See Hiibel, 542 U.S. at 178, 124 S.Ct. 2451; J.L., 529 U.S. at 271, 120 S.Ct. 1375.
A review of the cases upon which the Third District relied reveals that each decision involved a citizen informant who approached law enforcement before the stop or seizure occurred, thereby establishing the reliability of the tip pre-seizure. See United States v. Holmes, 360 F.3d 1339, 1340-41 (D.C.Cir.2004) (pedestrian informed police that he had observed the brandishing of a handgun before police stopped Holmes), vacated and remanded on other grounds, 543 U.S. 1098, 125 S.Ct. 1046, 160 L.Ed.2d 992 (2005); United States v. Heard, 367 F.3d 1275, 1277 (11th Cir.2004) (woman on subway informed officer that Heard was carrying a weapon before seizure occurred); United States v. Valentine, 232 F.3d 350, 352-53 (3d Cir. 2000) (citizen informed police that he had observed a person with a firearm before police stopped Valentine); United States v. Christmas, 222 F.3d 141, 143 (4th Cir. *296 2000) (resident informed police that individuals at house located two doors down possessed guns and drugs before Christmas was seized); State v. Maynard, 783 So.2d 226 (Fla.2001) (call from mother advised police that her son was in possession of an Uzi machine gun before police detained Maynard); Castella v. State, 959 So.2d 1285, 1287 (Fla. 4th DCA 2007) (citizens advised police that a boat accident had occurred and identified Castella's boat as being involved before law enforcement approached Castella); Manning v. State, 957 So.2d 111, 112-13 (Fla. 4th DCA 2007) (burglary victim informed police that a person from the neighborhood told him that it was Manning before seizure of Manning occurred); Milbin v. State, 792 So.2d 1272, 1273 (Fla. 4th DCA 2001) (victim of assault with a firearm provided police with a physical description of the assailant and the location where incident occurred before police seized Milbin); Carattini v. State, 774 So.2d 927, 928 (Fla. 5th DCA 2001).
Further, even if we ignore the evidence from the suppression hearing and look into evidence offered during trial, we are unable to locate any federal or Florida decisions which hold that an originally anonymous informant who appears post-seizure, then disappears and remains anonymous, can after-the-fact be deemed a citizen informantwhose reliability is presumed. Thus, in consideration of the fact that the seizure of Baptiste at gunpoint occurred before the alleged 911 anonymous caller approached the officers and then disappeared, the cases relied upon by the Third District do not support the conclusion that an individual who approaches law enforcement after a suspect is seized may be considered in the determination of whether the initial stop is valid. Rather, such an individual remains an anonymous tipster for purposes of evaluating the constitutional validity of a Terry stopin fact, the tipster here is still completely anonymous.

Officer Williams Lacked Reasonable Suspicion to Detain Baptiste.
Under the totality of the circumstances offered by the record in this case, the seizure of Baptiste violated the Fourth Amendment. Similar to J.L., the police here received only an anonymous tip stating that a black male wearing a white T-shirt and blue-jean shorts in a described location was in possession of a gun. Since this incident occurred in the warm climate of South Florida, it would be difficult to imagine a more generic form of attire. Indeed, the white T-shirt here is even less distinguishing than the plaid shirt worn by J.L. Further, like the anonymous tipster in J.L., the tipster here did not provide predictive-conduct information indicating any "inside" knowledge about Baptiste, nor did he offer any predictive information that would have corroborated his claim that Baptiste was engaged in illegal conduct. As in J.L., when the officer arrived on scene, she was only able to corroborate innocent details (i.e., Baptiste's race, his attire, and his location near the address identified in the 911 call). Further, Baptiste was not engaged in any unlawful acts, unusual conduct, or suspicious behavior; he was merely walking down the street. Since the tip was reliable solely in "its tendency to identify a determinate person" and not "in its assertion of illegality," see J.L., 529 U.S. at 272, 120 S.Ct. 1375, we conclude that like the officers in J.L.the police here lacked reasonable suspicion to seize Baptiste at gunpoint.
Our conclusion is consistent with other cases in which courts have determined that an anonymous tip failed to provide police with the necessary reasonable suspicion to initiate an investigative stop. In United States v. Johnson, 427 F.3d 1053 (7th Cir. 2005), a tipster provided information that

*297 a "John Johnson" was in possession of a large amount of crack. The female caller stated that Johnson had picked up the crack in Muncie, Indiana, and brought it back to his "Fulton Street address" in the town of Anderson. The tipster also stated that Johnson picked up crack shipments on Thursdays and drove a white vehicle, but she offered no other details and did not explain the basis of her knowledge. The information was not otherwise corroborated.

Id. at 1055 (emphasis supplied). The Seventh Circuit held that the officers lacked reasonable suspicion to seize Johnson after they arrived at his house and informed him of the subject matter of the tip. See id. at 1057; see also United States v. Patterson, 340 F.3d 368, 371 (6th Cir.2003) (anonymous tip that a group of males located at a street corner were conducting drug transactions failed to provide officer with reasonable suspicion to seize Patterson, who was standing with a group of people in front of a house near the corner, because "it was not specific enough as to a prediction of future unlawful activities"); Feathers v. Aey, 319 F.3d 843, 846, 849 (6th Cir.2003) (anonymous 911 call that a "white male with a beard on a porch on North Howard Street had pointed something at the caller and told the caller to shut up" did not provide officers with reasonable suspicion to detain Feathers, who matched the description and was standing on a porch on North Howard Street); Young v. State, 841 So.2d 689 (Fla. 2d DCA 2003) (anonymous tip that white male in jean shorts and black tank top at a mobile home park was armed with a firearm did not provide reasonable suspicion to stop Young, who met the description but was not acting suspiciously and officers could not see a firearm); Rivera v. State, 771 So.2d 1246, 1248 (Fla. 2d DCA 2000) (anonymous tip that two vehicles were exchanging gunfire at an intersection did not provide reasonable suspicion for officer to initiate stop of a vehicle which matched description provided in the tip where the police failed to observe "any unusual behavior, such as tailgating or an attempt to communicate").
This analysis, however, does not lead to a conclusion that an anonymous tip, such as was provided in the instant case, can never provide reasonable suspicion under a totality-of-the-circumstances analysis, nor does it preclude police officers from approaching a citizen and making inquiry. Even though an anonymous tip may not provide predictive information or the precise basis for the tipster's knowledge, subsequent observations of a suspect who matches the description given may afford officers reasonable suspicion to seize that suspect. For example, a federal appellate court has concluded that, even where the anonymous tip alone failed to establish reasonable suspicion, the fact that the suspect reached for his waistband upon seeing officers provided reasonable suspicion for initiation of a Terry stop. See United States v. Gooden, 273 F.3d 1100, 1100, 2001 WL 1075851 (5th Cir. 2001) (unpublished opinion).
Further, nervous behavior of a suspect upon the approach of an officer, when considered in conjunction with a purely anonymous tip, may under the totality of the circumstances establish reasonable suspicion for an investigative stop. For example, in United States v. Sims, 296 F.3d 284, 285 (4th Cir.2002), police received an anonymous tip that "a black male wearing a T-shirt and blue jeans had just fired a pistol in the area of 809½ Oakwood Avenue." The Fourth Circuit concluded that reasonable suspicion existed to stop the defendant where, upon arriving at a vacant lot on the other side of the building, an officer observed a black *298 male behind a nearby address in a crouched position, "peeking around the corner" and looking towards the officer. Id. at 286. As soon as the officer made eye contact, the man jerked back behind the house and out of view. See id. The federal court was careful to note that it was not holding "that the tip, by itself, or the conduct, by itself, would have justified a search." Id. at 287. Those later observations by the officer were essential and critical to the final evaluation.
Other factors which have been held to be relevant in a totality-of-the-circumstances analysis of reasonable suspicion are flight from the police, see United States v. Wynne, 27 Fed.Appx. 106, 107 (3d Cir.2002) (unpublished decision) ("Headlong flightwherever it occursis the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." (quoting Wardlow, 528 U.S. at 124, 120 S.Ct. 673)); and a history of burglaries at the specified address where the alleged illegal act occurred, see United States v. Goodrich, 450 F.3d 552, 554 (3d Cir.2006) (kiln operator at brickyard reported possible theft of anhydrous ammonia tanks from a farm-supply company located adjacent to brickyard; police had responded to numerous incidents at the farm-supply business and conducted routine surveillance of the tanks on the property).
Here, the record does not reflect any additional circumstances or facts which might have established a reasonable suspicion. At best, when the officer first observed Baptiste, he was merely walking down the streetnot running away from the grocery store or engaged in any suspicious conduct. Additionally, when the officers viewed Baptiste, he was not engaged in any illegal, suspicious, or furtive behavior, and the officers did not see a firearm or any bulges in his clothing indicative of a gun. Finally, although Baptiste may have had a prior arrest or conviction, none of the officers indicated that they knew of him or any criminal history before the present incident. Thus, the sole basis for seizing Baptiste at gunpoint was the purely anonymous tip which, according to the specific requirements of our United States Supreme Court, failed to provide reasonable suspicion for Officer Williams to believe that Baptiste had or was engaged in illegal or dangerous conduct.
If we were to conclude that reasonable suspicion existed to stop Baptiste, any anonymous tip could be used as a tool of harassmenta situation condemned by the Supreme Court in J.L. when it refused to create an exception for alleged possession of firearms. If this were the law, all a tipster would need to do is inform police that an individual had exhibited a firearm in publicrather than possessed a firearmand that person would be subjected to gunpoint seizure and an embarrassing public search by the police. For example, a resident who does not wish to see other persons in his or her neighborhood hypothetically could telephone a false tip that a person having a particular description had publicly displayed a firearm. Analogously, a man or woman who seeks revenge against and to harass an ex-girlfriend or ex-boyfriend could telephone a tip alleging that she or he had brandished a firearm in public.
Although the Third District relies upon United States v. Perkins, 363 F.3d 317 (4th Cir.2004), for the proposition that the display of a firearm constitutes an obvious and extremely dangerous circumstance, and a tip alleging such conduct will provide an officer with reasonable suspicion to stop a suspect for further investigation, the Third District misdirects the analysis conducted by the federal Fourth Circuit and its ultimate holding. The extensive facts *299 in Perkins are totally different from those properly within this record.[5] A cursory review demonstrates that much more detailed information was present in Perkins than a purely anonymous tipster providing a bare-bones tip that an individual at a certain address had waved a firearm. Indeed, the facts in Perkins are both qualitatively and quantitatively different from the facts of the instant case. In Perkins, the officer was actually aware of the identity of the tipster, who called often and who was later confirmed. See id. at 319. The Perkins tipster lived across the street from the address where the events in question were reported, and she had provided reliable information in the past. See id. In concluding that the stop was legal, the *300 federal court specifically stated that it had conducted a totality-of-the-circumstances analysis and cited a number of these qualitatively and quantitatively different facts in support of its conclusion. See id. at 322.
Thus, we do not accept that Perkins stands for the blanket proposition that a clearly anonymous tip alleging the public display of a weapon alone provides per se reasonable suspicion to conduct a Terry stop. Moreover, neither the Third District nor the State has presented a single case which stands for this proposition. Rather, Perkins and other decisions support the conclusion that a tip which alleges that an individual publicly brandished a firearm must be considered in light of all the circumstances present to determine whether reasonable suspicion has been established.
In the instant caseother than race, gender, and a most generic description of clothingno additional information was available to or developed by Officer Williams when she arrived on scene, nor had any developed prior to the gunpoint seizure, to support the anonymous allegation that Baptiste had waved a firearm. Therefore, under the totality of the circumstances, the police lacked reasonable suspicion to seize Baptiste at gunpoint when they observed him simply walking down the street and not engaged in any illegal or suspicious conduct. Accordingly, we hold that the stop of Baptiste at gunpoint solely on the basis of the anonymous tip is contrary to J.L. and violated the Fourth Amendment of the United States Constitution and article I, section 12 of the Florida Constitution.[6] Therefore, the trial court erroneously denied Baptiste's motion to suppress.
In reaching this conclusion, we note that in the conflict case, Rivera v. State, 771 So.2d 1246 (Fla. 2d DCA 2000), which involved more detailed information and more egregious conduct, the Second District properly determined that an anonymous tip failed to provide reasonable suspicion to initiate a traffic stop. In Rivera, an unidentified motorist informed the Tampa police that he saw the occupants of a white Mazda and a maroon Toyota exchanging gunfire at West Gandy Boulevard and South Dale Mabry Highway. See id. at 1247. The motorist provided the police with a license plate number for the Toyota. See id. A BOLO ("be on the lookout") was issued for the vehicles. See id. A police officer subsequently observed a white Mazda and a red Toyota Camry, with a license plate which matched the plate number provided in the anonymous tip, entering onto the I-275 ramp from Dale Mabry Highway. See id. The officer stopped the Toyota and both a firearm and heroin were recovered from Rivera, who was a passenger in the car. See id.
The Second District ultimately held that the BOLO did not provide the officer with a reasonable suspicion to stop the Toyota because the source of the information in the BOLO was an anonymous tip. See id. In reaching this holding, the Second District specifically noted that, despite the claim from the tipster that the occupants of the vehicles were exchanging gunfire, *301 police observed nothing that corroborated that assertion. See id. at 1248. The Second District noted that there was "no evidence in the record that police observed any unusual behavior, such as tailgating or an attempt to communicate." Id. The Second District further declined to uphold that stop on the basis that "the danger alleged in the tip was so great that it justified the stop even without a showing of reliability." Id. In rejecting this contention by the State, the Second District specifically relied upon the refusal of the Supreme Court to recognize a "firearm exception" to the reasonable suspicion standard. See id. We conclude that, unlike the Third District in the instant case, the Second District correctly applied the analysis of the Supreme Court in J.L. when it determined that the stop in Rivera was invalid. We further note that if an anonymous tip that the occupants of two vehicles are actively exchanging gunfire is insufficient to create an exception to the reasonable-suspicion standard established by the Supreme Court in Terry, then the anonymous allegation that an individual has publicly waved a firearm certainly does not warrant disregard of the standard.
Our holding today should not be interpreted to imply that, upon receipt of an anonymous call that someone has publicly waved a firearm, officers cannot or should not respond or approach that individual to further investigate the allegation and the circumstances. Rather, we merely hold that when investigating an anonymous tip, officers who are unable to independently corroborate criminal activity may not initiate a gunpoint seizure based upon confirmation of only innocent detailssuch as a physical descriptionwith absolutely no observation or development of any suspicious behavior. In the instant case, the officers could have approached Baptiste and engaged him in conversation in an attempt to investigate the tip, and this conduct would not have violated the Fourth Amendment. See United States v. Goddard, 491 F.3d 457, 460 (D.C.Cir.2007) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street...." (quoting Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)), cert. denied, ___ U.S. ___, 128 S.Ct. 1274, 170 L.Ed.2d 111 (2008)); see also J.L., 727 So.2d at 208 ("Of course, there was nothing to prevent the police from engaging in a consensual encounter with the trio or from questioning them concerning their possession of a weapon as reported in the anonymous tip.").
As noted from the cases discussed, had Baptiste appeared nervous, reached for his waistband, fled, or engaged in illegal or suspicious conduct, these ensuing events depending on the totality of the circumstancesmight have established reasonable suspicion for the officers to stop and frisk Baptiste. Thus, our decision today does not and is not intended to hamstring the police, nor does it place their personal safety at risk. Rather, our decision merely ensures that law enforcement officers execute their duties within the confines of state and federal constitutional boundaries. Indeed, to require reasonable suspicion prior to the initiation of a stop at gunpoint promotes sound police practice.
In his dissent, Justice Wells contends that even if the officer violated the Fourth Amendment when she seized Baptiste at gunpoint, the exclusionary rule should not be applied in the instant case. Of course, Florida has an express exclusionary rule included in article I, section 12 of our state constitution. Further, a review of the record demonstrates that the State never raised this contention in its brief, during oral argument, or during the trial court proceedings. It is a longstanding *302 principle of our jurisprudence that for a claim to be addressed by this Court, it must be raised by the party before the trial court, or it has been waived. See Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982) ("[I]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below."). We even apply this tenet in death caseswithout question, the most serious cases that we address, with the most severe consequences. See, e.g., Overton v. State, 976 So.2d 536, 546-47 (Fla. 2007) (claim that trial judge engaged in improper conduct procedurally barred on appeal where no objection raised and no motion to disqualify judge filed during the evidentiary hearing); Evans v. State, 975 So.2d 1035, 1042 (Fla.2007) (claim that it is unconstitutional to execute capital defendant because he is physically handicapped and mentally impaired not preserved in appellate proceeding because it was not raised in the postconviction motion). Justice Wells advances an argument never presented in this case.
If we do not make exceptions for defendants who face the ultimate penalty, we certainly should not spontaneously raise and adopt positions that could have been asserted during the instant proceedings but were not. The State never advanced this argument for discussion, and we will not do so on its behalf.

CONCLUSION
In modern society, we recognize that we are all exposed to near-daily news reports of violence both within our country and internationally. In this context, it is not unnatural to hear calls for greater leniency with regard to police practices in the alleged interest of preventing future crime. Nowhere is this position of fear more clear than in the dissent of Justice Wells, which relies upon recent horrific events to suggest that a less stringent standard than reasonable suspicion should apply where an anonymous tipster claims that he or she observed a firearm.[7] However, we must not and cannot allow fear of the unknown simply to siphon away the constitutional rights of American citizensrights which are the touchstone of our democratic society. The judicial branch must jealously guard against any encroachment on these rights based upon speculative fears. As noted by the United States Supreme Court:
The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient, or when expediency dictates otherwise, is a very dangerous doctrine and, if allowed to flourish, would destroy the benefit of a written Constitution and undermine the basis of our government.
Reid v. Covert, 354 U.S. 1, 14, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); see also Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 635, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (Marshall, J., dissenting) ("History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure.... [W]hen we allow fundamental freedoms to be sacrificed in the name of real or perceived exigency, we invariably come to regret it."). We must stand strong in the protection of individual rights and not follow a pattern that slowly *303 chips away at our liberty through fear in the name of purported protection from danger. As noted by philosopher David Hume, "[i]t is seldom that liberty of any kind is lost all at once."
Contrary to the conclusion of the Third District, we hold that this stop and search of Baptiste violated the Fourth Amendment. Accordingly, we quash the decision in Baptiste and approve the decision of the Second District in Rivera. We remand for further proceedings consistent with this opinion.
It is so ordered.
QUINCE, C.J., and ANSTEAD, and PARIENTE, JJ., concur.
CANTERO, Senior Justice, concurs in result only.
WELLS, J., dissents with an opinion, in which BELL, J., concurs.
WELLS, J., dissenting.
I dissent. It is my conclusion that the evidence (the gun) which the motion to suppress sought to exclude from the evidence should not be excluded based on a violation of the Fourth Amendment to the United States Constitution. The majority's opinion is incorrect and incomplete because after determining that there was a Fourth Amendment violation, the majority fails to consider the exclusionary rule.[8]
My analysis is based upon the clear, unequivocal statements by the Supreme Court, which we are constitutionally bound to follow in this Fourth Amendment case,[9] that the issue of the application of the exclusionary rule is a separate issue from whether there was a violation of the Fourth Amendment. In Hudson v. Michigan, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), the Supreme Court specifically rejected the indiscriminate application of the exclusionary rule. The Supreme Court stated that in the instances in which the exclusionary rule is to be applied to exclude evidence, the exclusionary rule is a sanction against law enforcement officers to prevent a future abuse by law enforcement officers. Illinois v. Krull, 480 U.S. 340, 348, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987).[10]
Here, there was no conduct by law enforcement officers which should be sanctioned. The majority states:
Our holding today should not be interpreted to imply that, upon receipt of an anonymous call that someone is publicly waving a firearm, officers cannot or should not respond or approach that individual *304 to further investigate the allegation and the circumstances.
Majority op. at 301. Therefore, the majority agrees that law enforcement officers should not be sanctioned for responding to the 911 call which came to law enforcement officers in this case that gave the description of a man waving a gun in the parking lot of a market at 5:45 a.m. in the northwest section of Miami. Not only do I agree that law enforcement officers should not be sanctioned for responding to the call, it is my view that law enforcement officers had a duty to respond and the speed with which they responded should be appreciated and praised.
The majority's extensive dissertation on the Fourth Amendment and anonymous tips reduces to a complaint that the law enforcement officer who conducted the Terry stop[11] used her weapon in making the stop:
[W]e merely hold that when investigating an anonymous tip, officers who are unable to independently corroborate criminal activity may not initiate a gunpoint seizure based upon confirmation of only innocent details....
Majority op. at 301. The majority then suggests that "[i]n the instant case, the officers could have approached Baptiste and engaged him in conversation in an attempt to investigate the tip." Id. The majority does not state whether the failure to follow the majority's suggested procedure should be sanctioned.
I believe that the failure to follow the majority's suggested procedure clearly should not be sanctioned. I believe that the majority's suggested procedure is unrealistic and is extremely dangerous to law enforcement officers.
Moreover, in the Terry case itself, the Supreme Court states that in Terry stops there has to be a concern for the safety of law enforcement officers:
[I]t would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.
Terry, 392 U.S. at 23-24, 88 S.Ct. 1868 (footnote omitted). In a footnote, the Supreme Court noted that in 1966, fifty-seven law enforcement officers were killed in the line of duty in this country. We know that last year, of the 181 law enforcement officers nationwide who lost their lives in the line of duty, sixty-eight officers were killed by gunfire.[12] We know the enormous costs of gun violence in our communities on a daily basis, and the tragedies of Virginia *305 Tech, Columbine, the Pinellas County Courthouse,[13] and many other places have to be, and should be, in the minds of our law enforcement officers in carrying out their duties.
Thus, when a 911 call comes in to law enforcement officers, saying that a man is waving a gun at 5:45 a.m. in a parking lot of a market in northwest Miami, officers must respond and should stop the man who meets the description of the man who reportedly waved the gun. I would hope and expect the law enforcement officer to protect herself by using her weapon to neutralize any use of a weapon by the man stopped. In fact, a law enforcement officer would be taking an unreasonable risk not to do that. On the other hand, to sanction law enforcement for a law enforcement officer properly protecting herself would present an unreasonable application of the exclusionary rule, would be in direct conflict with the most recent Supreme Court's holding in Hudson v. Michigan, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), in respect to the application of the exclusionary rule, and would unreasonably and unnecessarily place law enforcement officers in harm's way.
I agree with the Third District's holding in this case that the fact that the caller said that the person in the parking lot was waving the gun, and the fact that the anonymous caller came up to law enforcement at the scene and identified the defendant makes this case different from Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). However, even assuming that the Third District was in error and there was a violation of the Fourth Amendment, the majority is wrong in not considering the application of the exclusionary rule.
When the Supreme Court's recent holding in respect to the exclusionary rule is considered, it must follow that the evidence should not be excluded. In the 2006 term, the Supreme Court made the essential point:
Suppression of evidence, however, has always been our last resort, not our first impulse. The exclusionary rule generates "substantial social costs," United States v. Leon, 468 U.S. 897, 907[, 104 S.Ct. 3405, 82 L.Ed.2d 677] (1984), which sometimes include setting the guilty free and the dangerous at large. We have therefore been "cautio[us] against expanding" it, Colorado v. Connelly, 479 U.S. 157, 166[, 107 S.Ct. 515, 93 L.Ed.2d 473] (1986), and "have repeatedly emphasized that the rule's `costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application," Pennsylvania Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 364-365[, 118 S.Ct. 2014, 141 L.Ed.2d 344] (1998) (citation omitted). We have rejected "[i]ndiscriminate application" of the rule, Leon, supra, at 908, 104 S.Ct. 3405, and have held it to be applicable only "where its remedial objectives are thought most efficaciously served," United States v. Calandra, 414 U.S. 338, 348[, 94 S.Ct. 613, 38 L.Ed.2d 561] (1974)that is, "where its deterrence benefits outweigh its `substantial social costs,'" Scott, supra, at 363, 118 S.Ct. 2014 (quoting Leon, supra, at 907, 104 S.Ct. 3430).
We did not always speak so guardedly. Expansive dicta in Mapp [v. Ohio], for example, suggested wide scope for the exclusionary rule. See, e.g., 367 U.S. [643,] at 655[, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)] ("[A]ll evidence obtained by *306 searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"). Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568-569[, 91 S.Ct. 1031, 28 L.Ed.2d 306] (1971), was to the same effect. But we have long since rejected that approach. As explained in Arizona v. Evans, 514 U.S. 1, 13[, 115 S.Ct. 1185, 131 L.Ed.2d 34] (1995): "In Whiteley, the Court treated identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule to evidence secured incident to that violation. Subsequent case law has rejected this reflexive application of the exclusionary rule." (Citation omitted.) We had said as much in Leon, a decade earlier, when we explained that "[w]hether the exclusionary sanction is appropriately imposed in a particular case, ... is `an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" 468 U.S., at 906, 104 S.Ct. 3405 (quoting Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).
Hudson, 547 U.S. at 591-2, 126 S.Ct. 2159 (emphasis added).
In United States v. Herring, 492 F.3d 1212 (11th Cir.2007), cert. granted, ___ U.S. ___, 128 S.Ct. 1221, 170 L.Ed.2d 57 (2008), the Eleventh Circuit undertook an extensive analysis of the Supreme Court's application of the exclusionary rule when faced with a situation where police officers pulled over a defendant after being erroneously told that there was an active arrest warrant for the defendant. The court held that even though the search of Herring's person was not and could not be justified as incident to a lawful arrest since the arrest was not lawful, the evidence did not need to be suppressed under the exclusionary rule because there is a clear "distinction between finding a constitutional violation and excluding evidence based on that violation." Id. at 1215. In reaching this decision, the court outlined the two-step process used by the Supreme Court to determine when the exclusionary rule should be applied:
For guidance on this issue we return to [United States v.] Leon, [468 U.S. 897 (1984)]. The opinion in that case instructs us that "[w]hether the exclusionary sanction is appropriately imposed in a particular case ... must be resolved by weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence." 468 U.S. at 906. A rule that denies the jury access to probative evidence "must be carefully limited to the circumstances in which it will pay its way by deterring official lawlessness." [Illinois v.] Gates, 462 U.S. [213,] at 257-58 [(1983)]. That means the exclusionary rule should only be applied to a category of cases if it will "result in appreciable deterrence." United States v. Janis, 428 U.S. 433 (1976). Application of the rule is unwarranted where "[a]ny incremental deterrent effect ... is uncertain at best." United States v. Calandra, 414 U.S. 338 (1974). The possibility that application of the exclusionary rule in a situation may deter Fourth Amendment violations to some extent is not enough. Alderman v. United States, 394 U.S. 165, 174 (1969); see Leon, 468 U.S. at 910. Instead, the test for extending the exclusionary rule is whether the costs of doing so are outweighed by the deterrent benefits. Leon, 468 U.S. at 91.
....
To sum up, our review of Leon identifies three conditions that must occur to warrant application of the exclusionary rule. First, there must be misconduct by the police or by adjuncts to the law enforcement team. Id. at 913-17. Second, *307 application of the rule must result in appreciable deterrence of that misconduct. Id. at 909. Finally, the benefits of the rule's application must not outweigh its costs. Id. at 910.
Herring, 492 F.3d at 1216-17 (parallel citations and footnote omitted).
Using the three considerations from the Supreme Court's decision in Leon, I first conclude that there was no misconduct in the law enforcement officer protecting herself. Second, I do not believe that the Court should deter law enforcement officers from protecting themselves. Third, the benefits of law enforcement officers not using their weapons to neutralize the reported weapon of the suspect under these circumstances are nil, whereas the costs of law enforcement officers getting shot under such circumstances are devastating.
In conclusion, the majority agrees that law enforcement officers should have responded to the 911 call at 5:45 a.m., stating that there was a man waving a gun in the parking lot of a market in the northwest section of Miami. The majority agrees that the law enforcement officer could have approached the man described by the 911 caller and engaged him in conversation to investigate the tip. I do not agree with the majority that it was unreasonable and sanctionable for the police officer to protect herself from a person, who she could reasonably believe was armed with a gun, by pulling out her gun in the stop of this person. Nor do I agree with the majority that when it finds a violation of the Fourth Amendment, it does not then have to separately consider whether to apply the exclusionary rule.
BELL, J., concurs.
NOTES
[1] The trial transcript indicates that the first name of this officer was Teresa.
[2] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[3] In Terry, a detective observed two men standing on a street corner. See 392 U.S. at 5, 88 S.Ct. 1868. One of the men proceeded to walk down a street, pause to peer into a shop window, continue to walk a short distance, then turn around and walk back toward the other man, again pausing to peer in the shop window. See id. at 6, 88 S.Ct. 1868. The other man then performed the same exercise. See id. According to the detective, each man repeated this conduct approximately six times, so that the two men had walked the same route one dozen times and peered into the shop window two dozen times. See id. The United States Supreme Court concluded that the actions of the two men were consistent with the detective's hypothesis that the men were "contemplating a daylight robbery." Id. at 28, 88 S.Ct. 1868.
[4] A third police officer appeared at trial, who arrived only after both Officers Williams and Ellison had engaged Baptiste. Although the officer testified at trial (not at the suppression hearing) that he was approached by two anonymous individuals who advised that Baptiste had publicly waved a firearm, this exchange also occurred only after Baptiste was seized at gunpoint and on the ground.
[5] The facts as detailed by the Fourth District provide:

In the evening hours of May 5, 2002, an unidentified woman called the St. Albans, West Virginia police department and reported that there were two white males in the front yard of a duplex at 2740 Knox Avenue who were pointing and displaying rifles in various directions. She further reported that the men had arrived in a red car bearing a silver or white stripe. The dispatcher relayed all of this information to officers in the area.
Officer Mark Burdette and Sergeant T.A. Kemper were patrolling the area in separate units, and they responded to the call. Officer Burdette had been with the St. Albans police department for seven years and was familiar with the Knox Avenue area. He knew that Knox Avenue, a residential street where young children are commonly present, was a notorious high crime and drug trafficking area. Officer Burdette previously had participated with the police department's drug unit in four or five drug investigations on Knox Avenue and more in the surrounding area. In fact, Officer Burdette knew that 2740 Knox Avenuethe very unit where the caller had reported the disturbancewas one unit in a two-unit duplex, and that the other unit, 2738 Knox Avenue, was a known drug house and was presently under investigation for drug activity. Officer Burdette had personally arrested both of the female residents of 2738 Knox Avenue on several occasions for drug-related offenses. When Officer Burdette received the information from the dispatcher, he surmised that it was a "drug deal gone bad."
Although the caller did not identify herself, Officer Burdette believed that she was Mrs. Hayes, a woman who lived across the street from the duplex at 2738 and 2740 Knox Avenue. Officer Burdette stated that this belief was based on the detailed nature of the caller's description of the individuals and their conduct, which revealed that she was in "close proximity" to them. Officer Burdette knew that Mrs. Hayes lived "directly across the street" from the duplex. Moreover, he knew that she "normally is the one who calls in and complains and gives reliable information." Indeed, Officer Burdette testified, just in the instances in which he was involved, Mrs. Hayes had called and provided reliable information of drug or other illegal activity on Knox Avenue on at least six to ten prior occasions. Officers later confirmed that Mrs. Hayes was in fact the caller.
Officers Burdette and Kemper arrived at the duplex and found two vehicles parked in front of it. Officer Burdette pulled up behind them and identified the vehicle described by the caller, a small red car with a silver or white stripe. He saw two men in the car and found that they met the caller's description. He further recognized the passenger in the car as Mark Freeman, a "known drug taker" who lived on Knox Avenue. Moments later, the red car described by the caller pulled out from in front of the duplex and began driving off. Officer Burdette advised Sergeant Kemper that the red car was the vehicle that was described to them, and the officers initiated a traffic stop of the vehicle.
As the officers approached the car, Officer Burdette saw a loaded, high-powered rifle lying in plain view in an open gun case on the back seat. Perkins explained that he was trying to sell guns for his wife and openly volunteered that he had a felony conviction. Upon confirming with a dispatcher that Perkins had several prior felonies, Officer Burdette placed Perkins under arrest. Perkins consented to a search of his vehicle, and the officers discovered two more loaded guns, knives, and a variety of drug paraphernalia.
Id. at 319 (emphasis supplied).
[6] We have considered and reject that Florida citizens should be subject to street "take downs" at gunpoint based only on an anonymous tip as Justice Wells advocates in dissent. We decline to eliminate the requisite reasonable suspicion for a Terry stop under the Fourth Amendment, as required by the United States Supreme Court, solely because an unknown and unidentifiable person alleges that he or she saw a firearm. The constitutional right to be free from unreasonable searches and seizures should not be cast aside on the basis of nothing more than unsubstantiated claims from an anonymous voice over the telephone.
[7] Justice Wells has previously raised the identical assertion in his dissent to our prior decision in J.L.a decision which was affirmed by the United States Supreme Court. See 727 So.2d at 216 (Wells, J., dissenting) ("The majority's decision unnecessarily exposes many innocent residents of this state to severe harm from the violence of guns and without justification hinders law enforcement officers in their work to protect innocent residents.").
[8] Understandably, the trial court and the Third District did not deal with the exclusionary rule because those courts found no violation of the Fourth Amendment. The majority claims that the State has waived the exclusionary rule objection. This assertion obviously ignores that the State had no reason to raise the issue, just as the lower courts had no reason to consider the exclusionary rule because, until the majority's opinion, no court had found there to be a Fourth Amendment violation. It is only because of this Court's reversal of the decisions of the two lower courts that the discussion of the exclusionary rule became relevant and necessary. Clearly, finding there to be a waiver under this circumstance is fundamentally unfair.
[9] Art. I, § 12, Fla. Const. ("This right shall be construed in conformity with the Fourth Amendment to the United States Constitution, as interpreted by the United States Supreme Court.").
[10] The majority states that this same point was raised in my dissent in J.L. This is not accurate. The exclusionary rule was not discussed in J.L., and in fact, the United States Supreme Court's decision in Hudson was issued well after J.L. Moreover, an obvious distinction between this case and J.L. is that in this case, the caller reported that a person was not merely carrying a concealed weapon but was waiving the firearm at 5:45 a.m. in the parking lot of a business.
[11] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[12] National Law Enforcement Officers Memorial Fund, Law Enforcement Officer Deaths: 2007 Final Report (2008).
[13] Abhi Raghunathan, et al., Terror at Courthouse; Gunman's Motive Remains Unclear, St. Petersburg Times, May 8, 2008, at A1.