EMAS, J.
The State of Florida filed a delinquency petition alleging that D.P., a juvenile, committed the acts of carrying a concealed firearm and possession of a firearm by a minor. D.P. filed a motion to suppress the firearm on the ground that the arresting officer did not have reasonable suspicion to justify the pat-down search that led to the discovery of the firearm on D.P.’s person. The trial court denied D.P.’s motion to suppress and, following an adjudicatory hearing, the court adjudicated D.P. delinquent on both charges. D.P. appeals the *126 trial court’s order denying the motion to suppress. We affirm.
The evidence presented at the hearing on the motion to suppress revealed the following:
Officer Tate was on patrol and in uniform when he responded to a call at about one o’clock in the morning regarding juveniles loitering in a parking lot following a party. When Officer Tate arrived, a young woman approached him. Officer Tate described the woman as very nervous and fearful; her hands were shaking and she was yelling. The young woman pointed directly at D.P. and told the officer “he just pointed a gun at me, and he has a gun.”
Officer Tate believed the young woman was credible, given her fearful state and outward appearance. Although Officer Tate could have obtained the woman’s identity at that point, he did not do so; instead, he approached D.P. to verify the information he had just been provided.[1]
Officer Tate advised D.P. that someone reported that he (D.P.) had a gun on him. D.P. said it was not him, but some other boy. Officer Tate told D.P. that he wanted to conduct a pat-down search for officer safety, to make sure D.P. had no weapons on him. D.P. then began backing away from the officer, at which point Officer Tate became concerned that D.P. might be armed.
Officer Tate directed D.P. to put his hands on a nearby vehicle, and then conducted a pat-down search of D.P.’s outer clothing. Feeling a hard metallic object in D.P.’s right front pocket, Officer Tate removed what turned out to be a firearm. After taking D.P. into custody, Officer Tate discovered that the young woman had left.
In Teiry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),[2] the United States Supreme Court announced an exception to the fourth amendment’s probable cause requirement: temporary seizures and minimally intrusive searches of the person are permissible when a law enforcement officer has an objectively reasonable suspicion that criminal activity may be afoot and that the person may be armed.
[Wjhere a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others’ safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken.
Id. at 30-31, 88 S.Ct. 1868.
In Terry, the officer’s own observations provided the requisite reasonable *127 suspicion. However, information from a third party may also provide the necessary reasonable suspicion to justify a temporary detention and pat-down search of a subject. In analyzing whether third-party information can provide the requisite reasonable suspicion, courts have looked to the reliability of the informant as well as the reliability of the information provided. In its analysis, the trial court must consider the “totality of the circumstances.” Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). As the United States Supreme Court observed in that case:
Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause ... [T]he unverified tip from [a] known informant might not [be] reliable enough to establish probable cause, but [is] nevertheless sufficiently reliable to justify a Terry stop. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors — quantity and quality — are considered in the “totality of the circumstances — the whole picture,” United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.
Id. (citations omitted).
At the low end of the reliability scale is the anonymous tipster. This individual neither identifies herself nor provides any contact information. Absent some corroboration of the information provided or other indicia of reliability, the anonymous tipster is generally considered too unreliable to provide the reasonable suspicion necessary for a Terry stop. See, e.g., Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); Baptiste v. State, 995 So.2d 285 (Fla.2008); Hetland v. State, 387 So.2d 963 (Fla.1980).
On the other end of the reliability scale is the known informant, whose identity is known to the officer and who has provided reliable and verifiable information in the past. These informants have an established reputation of reliability with law enforcement, and can be held accountable if their information proves to be fabricated.[3] Information provided by these known informants is generally found to have a greater indicia of reliability and therefore can often provide the reasonable suspicion necessary for a Terry stop. See, e.g., Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
The citizen informant is situated on the reliability scale somewhere between these two extremes. As our Supreme Court observed in Baptiste:
State and federal case law establishes that the reliability of a tip which alleges illegal activity varies based upon whether the tip is truly anonymous, such as an *128 anonymous telephone call, or whether it is offered by a “citizen informant” who approaches the police in person to report criminal activity. A tip from a citizen informant falls at a higher end of the reliability scale.
995 So.2d at 291.
D.P. urges us to classify the young woman as an anonymous tipster; the State argues that she is a citizen informant. We agree with the trial court that, under the totality of the circumstances, and notwithstanding that she never identified herself to the officer, the young woman bears a greater resemblance to a citizen informant than she does to a truly anonymous tipster.
Unlike a “truly anonymous” tipster, see Baptiste, 995 So.2d at 291, the young woman in the instant case did not simply make an anonymous phone call. Rather, she provided her information on the scene, in a face-to-face encounter with the officer, in the presence of D.P.
Appellant argues that reversal is warranted based upon Solino v. State, 763 So.2d 1249 (Fla. 4th DCA 2000), and State v. Rewis, 722 So.2d 863 (Fla. 5th DCA 1998). However, each of these cases is factually distinguishable from the instant case. In Solino, a passing motorist flagged down a deputy to report that a bottle had been tossed out the window of a vehicle. The motorist gave the deputy a description of the vehicle, and the deputy soon thereafter stopped a vehicle matching that description. The informant did not give his name to the deputy, nor did the deputy take down the license tag of the informant. Following the stop, Solino was arrested for driving with a suspended license and was placed in handcuffs, at which time he ran from the scene. He was later captured and charged with escape.
Solino filed a motion to suppress, contending that the stop was based upon the unconfirmed report of an anonymous tipster. The deputy conceded that he made the stop based solely upon the statement of the unidentified motorist. The trial court denied the motion to suppress, finding that the deputy had reasonable suspicion to stop Solino’s vehicle. The Fourth District reversed, holding that the passing motorist was nothing more than an anonymous tipster who could not be identified or located and whose information was not corroborated. The deputy had not seen or heard anything that would have given him reason to stop the vehicle.
The Solino Court relied upon the analysis in Rewis, in which several deputies were on duty working a traffic detail at a highway rest stop. A motorist drove into the rest stop and told the deputies that he saw a Firebird weaving all over the road. The motorist provided the license number for the Firebird, and then drove away. The deputies did not obtain the motorist’s identity. At some point thereafter, the Firebird drove into the rest stop and the deputies stopped the vehicle, based solely on the motorist’s tip. Following the stop, the deputies found heroin in the vehicle. The trial court granted Rewis’ motion to suppress and the Fifth District affirmed, holding:
Although the deputies were given the tip by the passing driver, for all practical purposes he was an anonymous tipster. His identity is unknown, any means of locating him is unknown, as are his motives for disclosing the information. He might have pointed out the Firebird because he was angered by its driver, might have been cut off by the driver or been the recipient of an obscene gesture, or for any reason other than the one he gave deputies. The deputies had no way to corroborate the information, and agreed at the hearing that they had not themselves seen anything that would *129 have given them reason to stop the Fire-bird other than the tip.
Rewis, 722 So.2d at 864.
First, it should be noted that Rewis and Solino were decided before the supreme court’s decision in Baptiste, which recognized a distinction between the “truly anonymous tipster” and a face-to-face (though unidentified) citizen informant. More importantly, however, the instant case presents additional circumstances absent from Rewis and Solino:
1. The information was provided to the officer at the scene and was immediately investigated; unlike Rewis and Solino, there was no time lag between law enforcement’s receipt of the information and the officer’s subsequent encounter with the, suspect.
2. The officer observed the demeanor and evaluated the credibility of the informant as she conveyed the information. Officer Tate testified that the young woman was nervous and fearful, and her hands shook as she spoke with him. Officer Tate believed, based upon these observations, that the woman provided reliable information to him.[4] In Rewis and Solino, no evidence was presented that the deputies evaluated the reliability or credibility of the informant or relied upon such observations or evaluations in making the initial stop.
3. By providing this information in the presence of D.P. himself, the informant exposed herself to the risk of reprisal (perceived or real) from D.P. or others who were present during the encounter.[5]
4. When Officer Tate told D.P. that he wanted to conduct a pat-down search to make sure he did not have a weapon, D.P. began backing away from the officer, which caused Officer Tate to believe that D.P. might be armed.
These additional factors serve to distinguish the instant case from Rewis and Solino. The circumstances in the instant case are largely indistinguishable from United States v. Heard, 367 F.3d 1275 (11th Cir.2004).[6] In Heard, a police officer on patrol responded to a call regarding a fight in a public train station. Upon arrival, he saw a man and a woman arguing. The woman demanded money from the man (Heard). Heard admitted to the officer that he owed the woman money. After the officer suggested that Heard pay the woman the money he owed her, Heard walked away. As Heard left, the woman told the officer that Heard was carrying a weapon. The officer turned toward Heard, made eye contact, and ordered Heard to put his hands up. The officer began walking toward Heard, and instructed the woman to remain at the station to give a statement. The woman instead caught an arriving train, never to be seen again by the officer. To protect his own *130 safety and those of the train station patrons, the officer conducted a Terry frisk, finding a firearm.
Heard was charged with possession of a firearm by a convicted felon, and moved to suppress the firearm. The trial court denied Heard’s motion. On appeal, the Eleventh Circuit framed the issue: “We must decide whether the anonymous face-to-face tip given to [the officer] contains ‘sufficient indicia of reliability[5] such that Gore had a reasonable suspicion to stop and frisk Heard.” Heard, 367 F.3d at 1278.
Distinguishing Heard, from the line of anonymous tip cases, the Eleventh Circuit found significant that the officer “had an opportunity to judge the reliability of the face-to-face informant in this case. A face-to-face anonymous tip is presumed to be inherently more reliable than an anonymous telephone tip because the officers receiving the information have an opportunity to observe the demeanor and perceived credibility of the informant.” Id. at 1279. The Court noted the officer’s testimony that the woman seemed frightened when she reported that Heard was armed, and the officer also assumed the woman and Heard had some type of relationship, since they argued over money and Heard paid the money she demanded. The Court also found that Heard’s “stunned” reaction when approached by the officer did not undermine or dispel the reasonable suspicion: “While a suspect’s adverse reaction to police may independently corroborate information provided by an anonymous informant, a compliance reaction does not correspondingly undermine the tip’s reliability.” Id. at 1280.
There are two factual differences between Heard and the instant case: in Heard, it appeared that the subject and the woman knew each other in some manner, which could be considered to enhance the reliability of the woman’s information. In our case, there was no evidence that D.P. and the young woman knew each other.
Additionally, in Heard, the subject appeared “stunned” and complied when the officer asked him to put his hands up. By contrast, in our case, D.P. backed away from the officer when the officer advised D.P. of the information provided by the young woman. This conduct by D.P., and the officer’s observation of it, provided additional support for the officer’s reasonable suspicion that D.P. was armed or involved in criminal activity. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (“Our cases have ... recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.”).
On balance, we find the analysis in Heard, to be well-reasoned and applicable to this case. Under the totality of the circumstances, the information provided by the young woman in a face-to-face encounter, together with Officer Tate’s observations of the young woman and of D.P., support the trial court’s finding that the officer had reasonable suspicion to temporarily detain D.P. and conduct a limited pat-down search for weapons. The trial court properly denied the motion to suppress.
Affirmed.

. Officer Tate was the only officer on the scene.

. Article I, Section 12 of the Florida Constitution guarantees its citizens the right to be free from unreasonable searches and seizures, and expressly provides that "this right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court.”

. See, e.g., Fla. Stat. § 817.49 (2010) ("Whoever willfully ... conveys ... to any law enforcement officer ... false information or reports concerning the alleged commission of any crime ... shall upon conviction thereof be guilty of a misdemeanor of the first degree

. This underlying indicia of reliability provides the very same rationale for permitting introduction of "excited utterances" as an exception to the hearsay rule. § 90.803(2), Fla. Stat. (2003). See, e.g., Marshall v. State, 915 So.2d 264 (Fla. 4th DCA 2005).

. See Baptiste, 995 So.2d at 291 (citing United States v. Christmas, 222 F.3d 141, 144 (4th Cir.2000)).

.We are required to interpret our constitutional search and seizure provision in conformity with the fourth amendment to the United States Constitution, as interpreted by the United States Supreme Court. In the absence of controlling precedent from the United States Supreme Court, our appellate courts may look to other state and federal court decisions for guidance. See, e.g., Higerd v. State, 54 So.3d 513 (Fla. 1st DCA 2010).