# Third District Court of Appeal

## State of Florida

Opinion filed July 29, 2015.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-318
Lower Tribunal No. 10-23519
_____


**Daniel Maxwell,**
Appellant,

vs.

**The State of Florida,**
Appellee.


An Appeal from the Circuit Court for Miami-Dade County, Thomas J. Rebull, Judge.

Carlos J. Martinez, Public Defender, and Manuel Alvarez, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Douglas J. Glaid, Senior Assistant Attorney General, for appellee.


Before ROTHENBERG, LOGUE, and SCALES, JJ.

ROTHENBERG, J.

The defendant, Daniel Maxwell, was tried and convicted for the second

degree murder beating death of Mark Branthoover ("the victim"). During the investigation, the defendant made various statements to law enforcement regarding the murder: (1) pre-<u>Miranda</u>[1] exculpatory statements made on August 7, 2010, to Officer Orlando Fleites, the officer who initially responded to the scene of the homicide; (2) subsequent post-<u>Miranda</u> exculpatory statements to Detective Raul Godoy on August 7, 2010, at the homicide office; and (3) post-<u>Miranda</u> incriminating statements made on August 11, 2010. The defendant sought to suppress only the post-<u>Miranda</u> exculpatory statements made to Detective Godoy on August 7, 2010, and the only issue raised in this appeal is the trial court's denial of the defendant's motion to suppress these statements. We affirm.

The facts relied on by the trial court are as follows. On the morning of August 7, 2010, Officer Fleites was dispatched to a bus-way on U.S. 1 and 104th Street in reference to a dead body. Upon Officer Fleites' arrival, he observed the defendant, who he knew from prior interactions, drinking a beer while seated on a bus bench near the body. Officer Fleites asked the defendant what happened to his friend. The defendant immediately responded that he had seen "the whole thing" and that he was the one who had called the police. When Officer Fleites asked the defendant what he saw, the defendant explained that he had been sleeping and was awakened by a noise. He then saw two black males attacking the victim, at which

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

point he grabbed a stick he found on the ground and scared the attackers away. The defendant then called 911.[2]

Believing the defendant was a material witness to the homicide, Officer Fleites told the defendant that he needed to remain on the scene to speak with the homicide investigators, who were on their way. The defendant, who said he was tired and did not want to stay, became belligerent, irate, agitated, and disruptive. He began screaming at Officer Fleites and tried to leave the scene. When Officer Fleites continued to try to talk to him, the defendant walked aggressively towards the officer with his hands balled into fists. Officer Fleites told the defendant that he needed to calm down, explained that the homicide detectives would be there soon, handcuffed the defendant for officer safety, and placed the defendant in the backseat of his police car. Officer Fleites further explained that the defendant is "a tall man," while he is only 5'6", and in his prior encounters with the defendant, which were in response to reports of disorderly conduct, the defendant was not easy to deal with. Officer Fleites told the defendant that he would remove the defendant's handcuffs when he calmed down, and apparently the defendant did calm down, because shortly thereafter, when Detective Godoy arrived, the defendant was no longer handcuffed.

---

[2] The defendant apparently provided a subsequent conflicting version of the events to Officer Fleites, but Officer Fleites did not provide the details of that statement during the motion to suppress.

3

Detective Godoy testified that when he approached the defendant it was his understanding that the defendant was a witness to the homicide. The defendant was calm and he was not in handcuffs. When Detective Godoy began speaking with the defendant, he noticed that the defendant had blood on his shirt and on his forehead, which aroused his suspicions. He asked the defendant if he was hurt, and the defendant stated that he was not, which further heightened his suspicion because he noticed a fresh abrasion or cut on the defendant's knuckles, which Detective Godoy testified appeared to him as though the defendant had hit something with his fists. Detective Godoy told the defendant that he needed to speak with him and that he would like to conduct the interview at the homicide office. The defendant, who was homeless, was initially concerned about the safety of his property (he had a metal kiosk nearby which contained some of his property and a book bag), but after Detective Godoy assured the defendant that the uniformed officers had secured the scene and would protect his property until they returned, the defendant agreed to go with Detective Godoy to the homicide office.

Upon arriving at the homicide office, the defendant was advised of his Miranda rights in a printed form, and the defendant executed the rights waiver form agreeing to speak with Detective Godoy without an attorney being present. The defendant did not and does not contest the voluntariness of his waiver or that he was properly advised of his rights. Thereafter, the defendant gave Detective

4

Godoy various conflicting accounts of what he allegedly witnessed in regard to the murder, and he eventually provided a taped statement. While these statements varied from the statements the defendant gave earlier to Officer Fleites on the scene, these statements, like his earlier statements, were all exculpatory.

Initially, the defendant told Detective Godoy that he was awakened by loud screams, and when he opened his eyes, he saw the victim being attacked by three black males, not two as he had stated earlier. The defendant said he located a pipe usually carried by the victim and used the pipe to fight off the assailants. During the fight, the defendant was struck in the back of the head. After the assailants fled, the defendant checked the victim, who appeared to have been badly injured, and then the defendant went to sleep. When the defendant awoke the following morning, he tried to wake the victim, but when the victim did not respond, the defendant called the police because he was unable to detect a heartbeat.

After additional questioning, the defendant's story changed again. In this later version of the events, the defendant stated that one of the black males actually had the pipe, and after the defendant disarmed him, the assailants ran away. The defendant also told Detective Godoy that the victim owed some black males money for some crack cocaine they had given the victim on credit.

The defendant was given coffee and lunch, and although the defendant's story continued to change, he consistently claimed that the victim had been

5

attacked by black male assailants and that the defendant fought with the assailants and was struck in the back of the head during the fight. After Detective Godoy interviewed the defendant, the defendant was driven back to 104th Street as promised by Detective Godoy.

The police continued with their investigation. Several days later, on August 11, Detective Godoy asked the defendant if he would come back to the police station, and the defendant agreed to go. After the defendant was readvised of and again voluntarily waived his Miranda rights, Detective Godoy told the defendant that the physical evidence was inconsistent with his account of the events. In response, the defendant told Detective Godoy that while he was sleeping that night, the victim began hitting his legs with a pipe. The defendant also said that when he tried to get up, the victim hit him in the head, so the defendant tackled the victim, the victim fell into the bushes, and the defendant punched the victim in the face until the victim lost consciousness. After the victim lost consciousness, the defendant picked up the pipe and struck the victim several times in the head and then he placed the pipe in the victim's hand. After providing this statement, the defendant was arrested and charged with second degree murder.

The defendant does not dispute that he was properly advised of his rights per Miranda and that he freely and voluntarily waived his rights. He does not allege any infringement of his constitutional rights as to his first pre-Miranda, on-the-

6

scene exculpatory statements to Officer Fleites on August 7, or his final post-Miranda inculpatory statements to Detective Godoy on August 11. His sole argument below and on appeal is that the post-Miranda exculpatory statements he gave to Detective Godoy at the homicide station on August 7 were tainted by his illegal detention and/or arrest by Officer Fleites on the scene. Essentially, the defendant contends that when Officer Fleites did not allow him to leave the scene and placed him in handcuffs without probable cause to believe he was involved in the victim's murder, he was illegally arrested or detained.

We begin our analysis by recognizing that both the Fourth Amendment to the United States Constitution and Article I, Section 12 of the Florida Constitution protect people only against **unreasonable** searches and seizures. Based on the totality of the circumstances, we do not find that the temporary handcuffing and detention of the defendant by Officer Fleites was unreasonable within the meaning of the Fourth Amendment. See Keeton v. State, 427 So. 2d 231, 232 (Fla. 3d DCA 1983) ("It was not unreasonable for police, responding immediately to the scene of a felony-murder, to detain appellant, who was confronted in a closed park, adjacent to the parking lot where the crime occurred shortly before midnight, after appellant told police officers that he had witnessed the flight of persons fitting the description of the alleged perpetrators.").

The reasonableness of the defendant's temporary restraint is, however, not

dispositive. That is because when Detective Godoy began speaking with the defendant, the defendant was no longer being restrained; while speaking with the defendant, Detective Godoy developed reasonable suspicion that the defendant was involved in the beating death of the victim; the defendant freely and voluntarily agreed to provide Detective Godoy with his statement at the homicide office after being assured that his property would be safe in his absence; the statements he provided to Detective Godoy on August 7 were made after being fully advised of his rights (and specifically that he did not have to speak with Detective Godoy if he did not want to); these statements were exculpatory, and they were simply modified versions of the statements the defendant voluntarily gave to Officer Fleites on the scene; and after providing these statements to Detective Godoy, the defendant was returned to his neighborhood[3] as promised.

When Detective Godoy arrived, the defendant had already calmed down and was no longer in handcuffs. Detective Godoy testified that the defendant was actually "chatty," and he seemed eager to tell him what had happened. However, as soon as Detective Godoy introduced himself to the defendant, Detective Godoy noticed that the defendant had blood on his shirt, a cut on his forehead, and bruised knuckles. But when he asked the defendant if he was injured, the defendant said "no." The victim had been brutally beaten to death and was covered with blood.

[3] The defendant was homeless. He was therefore returned to the area where he kept his belongings.

8

Detective Godoy testified that based on the defendant's injuries, the defendant's earlier demeanor (which was belligerent and aggressive), and the defendant's initial conflicting accounts of the events to Officer Fleites, he became suspicious. We conclude Detective Godoy's suspicions were reasonable, and thus, based on his reasonable suspicion, he was legally authorized to detain the defendant for further investigation. See § 901.151(2), Fla. Stat. (2010) ("Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state . . . the officer may temporarily detain such person . . ."); Baptise v. State, 995 So. 2d 285, 290 (Fla. 2008) (holding that "the existence of a reasonable suspicion is based upon specific and articulable facts, and the rational inferences that may be drawn from those facts"); State v. Lennon, 963 So. 2d 765, 768 (Fla. 3d DCA 2007) ("[I]n determining whether a police officer possesses reasonable suspicion to justify an investigatory stop, the court must consider the totality of the circumstances viewed in light of a police officer's experience and background."); Hernandez v. State, 784 So. 2d 1124, 1126 (Fla. 3d DCA 1999).

Thus, although the defendant was no longer being restrained when Detective Godoy began speaking to him, to the extent the defendant may not have felt free to terminate his encounter with law enforcement (there is no evidence in the record

9

that at this point the defendant was not free to leave), Detective Godoy possessed the reasonable suspicion necessary under the Fourth Amendment to temporarily detain the defendant. We also note that the unrefuted evidence was that when Detective Godoy arrived, the defendant was "chatty" and very eager to speak with the Detective, he agreed to speak with Detective Godoy at the homicide office, and he freely and voluntarily waived his rights in writing and provided the statements under review.

Additionally, and importantly, Detective Godoy told the defendant he would return the defendant to his "home," and Detective Godoy kept his promise. The record also reflects that after this August 7 contact with the police, the defendant continued to assist Detective Godoy with his investigation. On a later date he accompanied Detective Godoy to help him try to locate the individuals he had told Detective Godoy about on August 7, and he voluntarily returned to the homicide office on August 11 to speak further with Detective Godoy. It was only after the August 11 statements, which the defendant does not claim were unconstitutionally obtained, that the defendant admitted his involvement in the homicide and was arrested. We therefore find that based on the totality of the circumstances, the trial court did not err by denying the defendant's motion to suppress his August 7 exculpatory statements made to Detective Godoy at the homicide office.

We also find that any error in denying the defendant's motion to suppress

10

the August 7 exculpatory statements to Detective Godoy is harmless beyond a reasonable doubt. As stated earlier, the defendant does not dispute that his initial exculpatory statements to Officer Fleites on August 7 were constitutionally obtained. The defendant's subsequent exculpatory statements to Detective Godoy on August 7, after the defendant had been briefly detained, were simply varying versions of the exculpatory statements the defendant made to Officer Fleites: that when he was awakened by a commotion, he discovered the victim being attacked by black male assailants, he then assisted the victim and chased the assailants away. The statement that resulted in his arrest and conviction was the incriminating statement he made four days later on August 11.

The recorded statement the defendant made on August 11, which the defendant did not seek to suppress, reflects the following. While the defendant was asleep the victim began hitting his legs with a pipe, and when he tried to get up, the victim swung at him and hit him in the head. The defendant tackled the victim and punched him in the face until the victim lost consciousness. The defendant admitted that while the victim lay unconscious in the bushes where he had fallen, the defendant picked up the pipe and struck the victim several times on the head with the pipe because he was "really mad" at the victim. After he realized what he had done, he placed the pipe in the victim's hand. Based on the defendant's admissions that he struck the victim several times on the head with a

11

pipe after the victim was unconscious and clearly incapacitated, killing the victim, there is no reasonable possibility that any error in admitting the August 7 exculpatory statements to Detective Godoy contributed to the jury's verdict. See Stein v. State, 632 So. 2d 1361, 1365 (Fla. 1994) (finding that any error in the admission of Stein's statements was harmless given the incriminating evidence against him); Taylor v. State, 596 So. 2d 957, 973 (Fla. 1992).

Affirmed.