DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JANE JEISCHA ALDANA PEREZ,**
as Personal Representative of the
**ESTATE OF JHOURDAN HERNANDEZ,**
Appellant,

v.

**GREGORY TONY,** as Sheriff of Broward County,
Appellee.

No. 4D2023-0377

[April 3, 2024]

Appeal of nonfinal order from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Fabienne Fahnestock, Judge; L.T. Case No. CACE22014700.

Eric Rudenberg of Rudenberg & Glasser, P.A., Fort Lauderdale, for appellant.

Kristin Mackenzie, Assistant General Counsel, Broward County Sheriff's Office, Fort Lauderdale, for appellee.

MAY, J.

The difference between speculation and probable cause creates the issue in this appeal. The personal representative of an estate appeals a non-final order denying the decedent's motion to suppress and finding probable cause to support the continued seizure of cash by the Broward County Sheriff's Office ("BSO").[1] She argues the trial court erred in finding probable cause existed for the seizure and subsequently denying her motion to suppress on those grounds. We agree and reverse.

The BSO alleged the decedent was engaged in a workers' compensation insurance fraud scheme. On the date of the search and seizure, BSO officers saw the decedent leaving a check cashing store with what they

---

[1] The seized property's original claimant died while this appeal was pending. His wife, as personal representative of his estate, was substituted.

believed was a backpack full of cash.  They stopped the car and seized the cash.

The BSO alleged the cash was subject to forfeiture for two reasons: first, because the decedent used or attempted use the cash as an instrumentality in a suspected insurance fraud scheme under section 932.701(2)(a)5., Florida Statutes (2022); and second, because the decedent used the cash in the course of, derived from, or realized through racketeering activity under section 895.05(2)(a), Florida Statutes (2022).

- ● *The Investigation, Stop, and Seizure*

According to the probable cause affidavit for the seizure, the BSO investigated the decedent between June and September 2022 and concluded he was operating a workers' compensation insurance fraud scheme.  The detective who wrote the affidavit alleged he was familiar with this type of scheme through his "training and experience" as part of the BSO's money laundering task force.

He explained that in a typical scheme, an individual sets up a "shell company," which is generally structured as a limited liability company. Then, the individual obtains a workers' compensation insurance policy based on the shell company's lowly projected payroll expense, thus securing a correspondingly low premium.  The shell company's owner then "rents out" its certificate of insurance to uninsured construction companies.  Those companies are then able to secure construction contracts they would not have been able to lawfully obtain without proof of valid workers' compensation insurance.

The construction company's customers pay the shell company, as identified on the certificate of insurance.  The shell company's owner cashes the checks, which the uninsured construction companies then use to pay their workers.  The shell company's owner usually cashes the checks at check cashing stores to avoid the extensive paper trail which traditional banks create.  The shell company's owner then dissolves the company and sets up a new one before the insurance company's annual audit.

Here, the decedent incorporated a construction company called JMHA Global, LLC ("JMHA") in October 2021.  JMHA obtained a workers' compensation insurance policy in November 2021 based on an expected annual payroll of $120,000, which required an annual premium of about $16,000.

2

The insurance company cancelled JMHA's policy in July 2022, allegedly because no payroll had been reported. While the policy was in effect from November 2021 through July 2022, financial records show the decedent cashed more than $9 million in checks written to JMHA.

The BSO alleged the decedent used the $9 million for payroll expenses which JMHA did not report to its insurance company. The BSO estimated JMHA avoided paying more than $1 million in premiums by failing to report the additional payroll. Further, the BSO alleged the decedent incorporated JMHA "for the sole purpose of defrauding [its] contracted insurance company . . . [and] laundering [his] business-to-business checks through complicit money service businesses."

The BSO staged an enforcement action at a check cashing store on September 16, 2022. The decedent was witnessed getting out of the passenger side of a car and entering the store with a flat black Puma backpack. About 18 minutes later, he exited the store wearing a "more voluminous" backpack, got back into the passenger side, and the car pulled away.

The BSO followed the car and eventually stopped it. The BSO alleged it had probable cause to believe the occupants of the car were "involved in a crime" and in possession of currency obtained through an "organized scheme to defraud." BSO officers searched the car and seized more than $170,000 in cash from the decedent's backpack. However, the BSO never arrested or charged the decedent or the driver with any crime related to the investigation.

The probable cause affidavit for the seizure stated the cash was seized pursuant to the Florida Contraband Forfeiture Act, sections 932.701–7062, Florida Statutes (2022) ("the Forfeiture Act"). The BSO specifically alleged the cash was subject to forfeiture under section 932.701(2)(a)5. because it "was used or was attempted to be used as an instrumentality in the commission of, or in aiding or abetting in the commission of," any of the following felonies:

(1) organized fraud, in violation of section 817.034(4)(a)1., Florida Statutes (2022);

(2) workers' compensation insurance fraud, or conspiracy to commit that fraud, in violation of section 440.105(4)(f)3., Florida Statutes (2022);

(3) first-degree grand theft, or conspiracy to commit that theft, in violation of section 812.014(2)(a)1., Florida Statutes (2022);

(4) operating an unlicensed money service business, in violation of section 560.125(5)(c), Florida Statutes (2022);

(5) money laundering, in violation of section 896.101(5)(c), Florida Statutes (2022); or

(6) racketeering and/or conspiracy to commit racketeering, in violation of section 895.03(1) and/or (4), Florida Statutes (2022).

The BSO alleged the cash was also subject to forfeiture under the Florida RICO Act, sections 895.01–.06, Florida Statutes (2022) ("the RICO Act"), because it was "used in the course of, derived from, or realized through" conduct in violation of the Act. *See* § 895.05(2)(a), Fla. Stat. (2022).

- ### *The Motion to Suppress and Adversarial Preliminary Hearing*

The decedent moved to suppress the cash as evidence and requested an adversarial preliminary hearing to determine whether probable cause existed to support its continued seizure. *See generally* § 932.703(3)(a), (3)(c), Fla. Stat. (2022); *Golon v. Jenne*, 739 So. 2d 659, 661 (Fla. 4th DCA 1999).

The motion to suppress argued the cash was inadmissible because the BSO did not have reasonable suspicion or probable cause to justify the stop of the driver's car. Further, the BSO lacked evidence of the "core element" of the alleged workers' compensation insurance fraud scheme—i.e., evidence the decedent had misrepresented JMHA's payroll expenses to its insurance company.

The decedent argued cashing a large volume of checks is not illegal and the BSO had no evidence he used any of the $9 million on unreported payroll. The decedent suggested the cash could have been used to pay for JMHA's equipment, supplies, rent, or subcontractors who carried their own workers' compensation insurance.

The BSO responded the stop was justified under the "automobile exception" because the officers had probable cause to believe the car

contained evidence of criminal activity, specifically workers' compensation insurance fraud and money laundering.

The court heard the motion to suppress at the adversarial preliminary hearing. There, the BSO presented testimony from the detective who led the investigation and wrote the probable cause affidavit.

The detective testified he first noticed the decedent when he was conducting surveillance of another subject at a check cashing store in June 2022. That day, the detective observed the decedent go into the store carrying a black backpack that appeared "very light and flat" and then exit with the backpack that was "obvious[ly]" heavier and "more voluminous." The detective saw the decedent go into the check cashing store about thirty more times between June and July 2022.

The detective then determined, through law enforcement databases, the decedent had cashed more than $9 million in checks written to JMHA between November 2021 and June 2022. He confirmed JMHA had a workers' compensation insurance policy with an effective start date in November 2021 based on an expected payroll of $120,000 and would have paid more than $1 million in additional premiums if it had reported a payroll of $9 million. The detective believed the insurance company had cancelled the policy in July 2022 because JMHA had not reported any payroll.

The detective personally believed JMHA was a shell company primarily because it was registered at a residential address and failed to report any legitimate payroll. He also testified he had never seen the decedent go to an actual construction site.

After JMHA's insurance policy was cancelled, the detective saw the decedent going into the check cashing store about forty more times between July and September 2022. But during that time, the decedent no longer cashed checks written to JMHA. Instead, the detective believed the decedent was cashing checks written to two different entities, both of which the detective believed were "additional shell companies engaged in the same type of fraud."

The detective testified the decedent's personal banking records substantiated this belief by showing transfers to and from those entities. Other records showed the checks written to those entities had been cashed when the decedent had been at the check cashing store.

5

The detective testified this type of activity is "typical" of a workers' compensation insurance fraud scheme. He testified that on the day of the stop, he observed the decedent enter the check cashing store and come out with a backpack that "appeared hefty." That was when he decided to stop the car. He believed the cash in the decedent's backpack was "supposed to be for payroll," based on his experience with workers' compensation insurance fraud cases.

On cross-examination, however, the detective admitted he had no evidence the decedent had "lent out" JMHA's certificate of insurance. He admitted he had no specific evidence to show how the decedent had used the money from cashing the checks. He also admitted the decedent could have used the cash to make large purchases or pay its subcontractors, which would not have constituted a payroll expense if the subcontractors had their own workers' compensation insurance. And although the detective testified he had seen the decedent on one occasion leaving the check cashing store and giving "the bag" to a person in a Jeep, he also conceded he could not rule out that person was a subcontractor with its own insurance.[2]

In short, the detective admitted his belief the decedent was involved in workers' compensation insurance fraud was based solely on his general training and experience. His investigation was limited to the decedent's "illegal[] cashing [of] checks at a Check Cashing Store," and the detective did not have any specific evidence of how the decedent had used the cash.

- ***The Trial Court's Ruling***

The trial court denied the motion to suppress. The trial court found the stop of the car was lawful under the automobile exception because the BSO had probable cause to believe the decedent had committed several crimes and the car contained evidence of those crimes. The trial court made no findings regarding probable cause to support the continued seizure of the cash. The decedent moved for reconsideration, which the court failed to rule on.

The decedent, and now his Estate, appeals from the trial court's order.

---

[2] The detective also relied on the driver's statements made in an interview following the stop, but those statements are not relevant to whether probable cause existed to justify the stop. *See Baptiste v. State*, 995 So. 2d 285, 293–95 (Fla. 2008) (explaining that an anonymous tip by itself is not enough for an officer to have probable cause).

- ***The Appeal***

The decedent raises two arguments on appeal: (1) the trial court erred in denying his motion to suppress because the BSO lacked probable cause for the stop; and (2) the trial court erred in finding probable cause to support the continued seizure because the BSO failed to demonstrate probable cause the cash was an instrumentality in the commission of a felony. We agree the trial court erred in denying the motion to suppress and reverse.

We apply a mixed standard of review to a trial court's ruling on a motion to suppress: the trial court's findings of fact are entitled to deference, but its legal conclusions are reviewed de novo. *Lowery v. State*, 201 So. 3d 791, 793 (Fla. 4th DCA 2016).

Here, the trial court denied the decedent's motion to suppress because it agreed with the BSO that the stop was lawful under the automobile exception to the warrant requirement. Under the automobile exception, law enforcement may stop and search a car without a warrant if an officer has probable cause to believe the car contains evidence of a crime. *State v. Betz*, 815 So. 2d 627, 631 (Fla. 2002) (citing *Carroll v. United States*, 267 U.S. 132, 149 (1925)). This right, however, is not absolute, and if an officer has probable cause only for the trunk, then that officer can search only the trunk. *See id.*; *see also United States v. Ross*, 456 U.S. 798, 823 (1982) ("The scope of a warrantless search based on probable cause is no narrower-and no broader-than the scope of a search authorized by a warrant supported by probable cause.").

Probable cause only exists where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Betz*, 815 So. 2d at 631 (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)).

Here, the BSO argued, and the trial court ultimately found, BSO detectives had probable cause to believe the car contained evidence of workers' compensation insurance fraud and money laundering.[3]

---

[3] The reliance on money laundering may have been misplaced because the detective who wrote the probable cause affidavit alleged a belief the decedent had committed only workers' compensation insurance fraud.

The crime of workers' compensation insurance fraud, as alleged in this case, requires proof the decedent knowingly assisted, conspired with, or urged another to knowingly make a false, fraudulent, or misleading statement, or to knowingly omit, or conceal, material information required by section 440.381, Florida Statutes (2022), for the purpose of diminishing JMHA's workers' compensation insurance premiums. § 440.105(4)(b)4., (b)5., Fla. Stat. (2022).

The crime of money laundering, as alleged in this case, requires proof the decedent knowingly conducted or attempted to conduct a financial transaction involving the proceeds of "specified unlawful activity," for the purpose of either (1) concealing or disguising the nature, location, source, ownership, or control of proceeds, or (2) avoiding a transaction reporting requirement. § 896.101(3)(a)2.a.–b., Fla. Stat. (2022).

Thus, both crimes alleged require evidence the decedent knowingly made a false statement or material omission to JMHA's insurance company as to its expected payroll expenses. *See* § 440.105(4)(b)4., (b)5., Fla. Stat. (2022); § 440.381(1), Fla. Stat. (2022); § 896.101(3)(a)2., Fla. Stat. (2022).

But these are the only facts which the BSO's officers knew at the time of the stop. First, the decedent incorporated JMHA in October 2021 and registered it at a residential address. Second, JMHA obtained a workers' compensation insurance policy in November 2021 based on an expected annual payroll of $120,000. Third, the decedent used a check cashing store to cash more than $9 million in checks to JMHA between November 2021 and July 2022. Fourth, JMHA's insurance policy was cancelled in July 2022 because it never reported any payroll.

Last, the decedent was repeatedly observed going into a check cashing store between June and September 2022. Each time, he was seen entering the store with an empty backpack and leaving with a "more voluminous" one. He was also seen delivering cash to an unidentified person on at least one occasion. On the date of the stop, he was seen leaving a check cashing store with a black backpack that appeared heavy.

The detective who led the investigation and drafted the probable cause affidavit testified about Florida's "typical" workers' compensation insurance fraud scheme. He admitted, however, the BSO did not have any evidence the decedent had allowed anyone else to use JMHA's certificate of insurance. He also admitted the BSO did not have any evidence as to how the decedent had spent the money from JMHA's cashed checks.

The detective testified the money was "supposed to be for payroll," but admitted this belief was based solely on his experience with Florida's "typical" workers' compensation insurance fraud scheme, not case-specific evidence. He also admitted the decedent could have used the money for any number of things other than payroll.

The decedent now argues on appeal the stop was unlawful, because without evidence he had used the money from cashing the checks written to JMHA for payroll, the BSO lacked probable cause to believe he had made a false statement or material omission to JMHA's insurance company about its expected payroll. *See* § 440.105(4)(b)4., (b)5., Fla. Stat. (2022); § 440.381(1), (2), Fla. Stat. (2022); § 896.101(3)(a)2., Fla. Stat. (2022).

The decedent also argues the BSO did not have probable cause to believe the car contained evidence of the alleged crimes. JMHA's insurance policy had been cancelled by the time of the stop, and the detective testified the decedent was no longer cashing checks written to JMHA. Thus, there was "no logical way" the car could have contained evidence of JMHA's alleged insurance fraud scheme.

Although the detective testified he had suspected the decedent had been cashing checks made out to two other shell companies around the time of the stop, the BSO did not present any evidence of who wrote the check(s) cashed immediately before the stop was made. Nor did the BSO allege either of the two additional shell companies had obtained a workers' compensation insurance policy based on misrepresented payroll expenses.

We hold the trial court erred in denying the decedent's motion to suppress. The BSO's reliance on the automobile exception to justify the stop of the car is unavailing as it lacked probable cause to believe the car contained evidence of workers' compensation insurance fraud or money laundering. The BSO did not and cannot point to any specific information justifying its belief the cash in the decedent's backpack came from cashing a check written to any company with a workers' compensation insurance policy based on a false statement or material omission as to the company's payroll expenses. *See* § 440.105(4)(b)5., Fla. Stat. (2022); § 440.381(1), Fla. Stat. (2022); § 896.101(3)(a)2., Fla. Stat. (2022).

The detective may have had an educated "hunch" based on his training and experience that the decedent had been engaged in a "typical" workers' compensation insurance fraud scheme. But his "hunch" or "mere suspicion" does not equate to probable cause to justify the stop of the car. *See Ray v. State*, 40 So. 3d 95, 98 (Fla. 4th DCA 2010) (holding an officer's

narcotics sale training does not compensate for a lack of other factors that would support probable cause).

Because we conclude the trial court erred in denying the motion to suppress, we need not address whether the trial court erred in finding probable cause to support the continued seizure of the cash. On remand, the trial court shall order the BSO to return the seized cash to the decedent's estate.

*Reversed and remanded with instructions.*

CIKLIN and FORST, JJ., concur.

\*       \*       \*

***Not final until disposition of timely filed motion for rehearing.***

10